**EXHIBIT A**

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Delaware  [▼]

| | |
|---|---|
| ENZOLYTICS, INC. | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) |
| CIMARRON CAPITAL, LTD. | ) |
| and KONA CONCEPTS, INC. | ) |
| _____ | ) |
| *Defendant* | ) |

Civil Action No.  21-1599-RGA; 21-1600-RGA

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Stephen M. Hicks, 17210 Germano Ct., Naples, FL 34110-2850

_____
*(Name of person to whom this subpoena is directed)*

☛ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Exhibit A

| Place: Cozen O'Connor, Attn: Kaan Ekiner, Esq., 1201 North Market Street, Suite 1001, Wilmington, DE 19801 | Date and Time: April 26, 2023  9:00am |
|---|---|

❐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ John J. Muldoon, Esq. |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Cimarron Capital, Ltd. and Kona Concepts, Inc., Defendants, Counterclaim Plaintiffs        , who issues or requests this subpoena, are:
John J. Muldoon, 111 West Washington Street, Suite 1500, Chicago, IL 60602, (312) 739-3550, jjm@muldoonlaw.com

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 21-1599-RGA; 21-1600-RGA

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____                    _____

                                                          *Server's signature*

                                                  _____

                                                          *Printed name and title*

                                                  _____

                                                          *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT "A" TO SUBPOENA

## DEFINITIONS

For purposes of this subpoena, the following "Definitions" shall apply:

1.      "251(g) Transaction" shall refer to the transaction that was consummated in November 2020 pursuant to 8 *Del. C.* § 251(g) in which Enzolytics Merger Corp. merged with and into ENZC Sub, Inc.

2.      "Communication" refers to each and every means of transmitting information to another person and/or entity, including but not limited to transmissions of information by electronic mail, writing, oral conversation, document, correspondence, computer files and printouts, text messages, instant messages sent through communications applications or software (e.g., Jabber, Lync, Skype), telephone, facsimile, telegram, and/or recording.  Where there is a request to identify a communication, state the type of communication (e.g. conversation, letter, telephone call, etc.), the date and time of the communication, all persons who participated in the communication at the time of its occurrence, and the substance of the communication. A document or thing transferred, whether temporarily or permanently, from one person to another is deemed a communication between such persons, whether or not such document or thing was prepared or created by the transferor or addressed to the recipient.

3.      "Second Amended Counterclaims" refers to the Second Amended Counterclaim filed by Cimarron Capital, Ltd. on February 27, 2023 in *Enzolytics, Inc. v. Cimarron Capital, Ltd.*, C.A. No.: 1:21-cv-01599-RGA, attached as **Exhibit 1**, and the Second Amended Counterclaim filed by Kona Concepts, Inc. on February 27, 2023 in *Enzolytics, Inc. v. Kona Concepts, Inc.*, C.A. No.: 1:21-cv-01600-RGA, attached as **Exhibit 2**.

4.      "Concerning," "relate to," "related to," and "relating to" are to be given their broadest possible meaning, and include the terms constitute, comprise, mention, describe, contain, enumerate, involve, concern, pertain to, refer to, represent, evidence, corroborate, support, discuss, record, explain, portray, and depict.

5.      "Date" means the exact day, month, and year if ascertainable or, if not ascertainable, the best approximation of the date along with a proper indication that such date is an approximation. A date may be approximated by describing it in relation to other events.

6.      "Document" shall include the plural and shall mean without limitation all written or printed matter of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, including without limitation: specifications, drawings, correspondence, memoranda, notes, diaries, statistics, letters, telegrams, telexes, teletypes, telefax, telecopies, minutes, agendas, contracts, reports, studies, surveys, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice and intra-office communications, offers, notations of any sort of conversations (including telephone conversations and meetings), bulletins, printed matter, computer printouts and records, invoices, work sheets, accountant's notes, work papers and all drafts, alterations, modifications, changes and amendments of any of the foregoing, graphic or oral records of representations of any kind (including but not limited to blueprints, diagrams, drawings, sketches, pictures, models, plans, specifications, "details," photographs, charts, graphs, microfiche, microfilm, videotape, records and motion pictures) and electronic, mechanical or electric records or representations of any kind (including but not limited to tapes, cassettes, discs and records).  "All documents" means every document as defined above, whether an original or a copy, in Your possession, custody or control,

and/or known to You, as well as every document that You can locate or discover by reasonably diligent efforts.  In each instance, You must specifically identify the document.

7.      "Enzolytics" shall refer to Enzolytics, Inc., the publicly traded company that survived the 251(g) Transaction that was consummated in November 2020, as well as its officers, directors, employees, agents, affiliates, subsidiaries, predecessors in interest, successors in interest, assigns, and/or any entity under their direction and control, and all other persons acting, or purporting to act, on its behalf or in concert with, as well as any entities that control, are controlled by, are under common control with, or otherwise affiliated with it.

8.      "Livingston" shall refer to the entity known as Livingston Asset Management.

9.      "Person" means any natural person or any business, legal, or governmental entity or association.

10.      "Ray" shall refer to the individual known as Billy V. Ray.

11.      "Seacor" shall refer to the entity known as Seacor Capital Inc., including its officers, directors, employees, agents, and affiliates.

12.      "Sky Direct" shall refer to the entity known as Sky Direct, LLC, including its officers, directors, employees, agents, and affiliates.

13.      "Southridge" shall refer to the entity known as Southridge Partners.

14.       "You" or "Your" means Stephen M. Hicks, the responding party, as well as any and all Persons under Your direction and control, and all other Persons acting, or purporting to act, on your behalf.

15.      To the extent that terms or phrases in these Interrogatories are not specifically defined herein, they shall retain their common meaning.

16.     Any reference to any third party refers to that person or entity, any predecessor or successor persons or entities, and any of the third party's agents, officers, directors, employees, representatives, attorneys, accountants, assignees, and all other persons acting, or purporting to act, on its behalf or in concert with the third party.

## INSTRUCTIONS

A.     Each request shall be deemed to call for the production of all original Document or Documents, or identical copies, within your possession, custody, or control, including any drafts, versions, or copies that differ in any respect from the original.

B.     If a request for production calls for the production of a Document or Documents that you assert is privileged, identify the author, addressee, and all recipients of copies of the Document, setting forth the date and general subject matter thereof, and state the basis for the claim of privilege.  An objection or claim of privilege directed to part of a request does not obviate the requirement to respond to the parts of the request for which no objection to claim of privilege is made.

C.     If a request cannot be produced in full, respond to the extent possible and specify the reasons for your inability to answer.

D.     These requests for production are continuing, and should you acquire any additional information responsive to these requests, please supplement your responses accordingly.

E.     Electronically stored information ("ESI") should be produced, as far as reasonably possible, in either native format or TIFF format with linked text files, with all metadata preserved.

## DOCUMENT REQUESTS

1.     Contracts and agreements entered into between Southridge and Enzolytics, including any debt instruments, such as debentures and promissory notes.

2.      Communications between Southridge and/or You on one hand and Enzolytics on the other concerning all contracts and agreements entered into between Southridge and Enzolytics, including any debt instruments, such as debentures and promissory notes.

3.      Communications between Southridge and/or You on one hand and Ray on the other concerning all contracts and agreements entered into between Southridge and Enzolytics, including any debt instruments, such as debentures and promissory notes.

4.      Documents and communications with any Person concerning the 251(g) Transaction, including any notice provided to You or Southridge by any person of the 251(g) Transaction.

5.      Documents and communications with any Person concerning Southridge's efforts to convert any debt or amount due and owing to Southridge into shares of stock of Enzolytics.

6.      Communications between Southridge and/or You on one hand and Ray on the other concerning the 251(g) Transaction.

7.      Documents and communications sufficient to determine the date and terms upon which Southridge converted any debt or amount due and owing to Southridge into shares of stock of Enzolytics, including, specifically, the name of the entity in which Southridge received equity.

8.      Documents and communications concerning the allegations made in the Second Amended Counterclaims.

9.      Documents sufficient to demonstrate Your relationship with Southridge, to include any ownership or management interest.

10.     Communications between Southridge and/or You on one hand and Seacor and/or Sky Direct, and/or Livingston on the other concerning the conversion of any debt into shares of stock of Enzolytics.

11.     Communications between Southridge and/or You on one hand and Seacor and/or Sky Direct and/or Livingston on the other concerning the 251(g) Transaction.

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ENZOLYTICS, INC,

       Plaintiff,

  v.

CIMARRON CAPITAL, LTD.,

       Defendant.

C.A. No.: 1:21-cv-01599-RGA

TRIAL BY JURY DEMANDED

### DEFENDANT/COUNTERCLAIM PLAINTIFF CIMARRON CAPITAL, LTD'S SECOND AMENDED COUNTERCLAIM

Defendant/Counterclaim Plaintiff, Cimarron Capital, Ltd., by and through its undersigned counsel, brings this Second Amended Counterclaim against Plaintiff/Counterclaim Defendant, Enzolytics, Inc. and states as follows:

### PARTIES

1.    Cimarron Capital, Ltd. ("Cimarron") is a corporation duly formed in Nevada that maintains its principal office and place of business in Boca Raton, Florida.

2.    Peter Aiello ("Aiello") is an individual residing in the State of Florida.

3.    Aiello is the sole shareholder of Cimarron.

4.    At all times relevant, Aiello was a shareholder of Enzolytics, Inc.

5.    Enzolytics, Inc. was incorporated in Delaware in 2004 as "T&T Homes Limited." The entity's name changed several times over the years. As relevant here, the entity changed its name on the following dates: in March 2009, to Extreme Mobile Coatings Worldwide Corp.; in November 2012, to Eco-Petroleum Solutions, Inc.; in January 2018, to Enzolytics, Inc.; at some point prior to November 16, 2020, to ENZC SUB, Inc. Enzolytics, Inc. and its predecessors will hereinafter be referred to as "Enzolytics" or "ENZC."

6.    Billy V. Ray ("Ray") is an individual and, upon information and belief, an officer, or *de*

*facto* officer of Enzolytics.

7. Up until the events relevant to this counterclaim, Aiello and Ray were close personal friends.

8. In 2014, Ray was convicted of Securities Fraud in the United States District Court for the Southern District for the Southern of Florida and sentenced to eight months in prison.

9. In 2014 Ray was also permanently enjoined from acting as an officer or director of publicly traded companies such as Enzolytics.

10. Harry Zhabilov ("Zhabilov") is an individual and an officer of Enzolytics.

11. Up until the events relevant to this counterclaim, Aiello and Zhabilov were close personal friends.

12. Charles Cotropia ("Cotropia") is an individual and the Chief Executive Officer ("CEO") of Enzolytics.

13. Livingston Asset Management ("Livingston") is a Florida limited liability company that maintains its principal office and place of business in the State of Florida.

14. Livingston also has an office at 850 Third Avenue, Suite 16C, New York, NY 10022.

15. Livingston is owned and managed by Steven Hicks ("Hicks").

16. Southridge Partners II ("Southridge") is a Delaware general partnership.

17. Hicks is also the manager of Southridge.

18. In August 2017, the United States District Court for the District of Connecticut entered judgment against Hicks and Southridge in excess of $5,000,000 for misappropriation of clients' funds.

19. Seacor Capital Inc. ("Seacor") is a New York corporation that maintains its principal office and place of business at 850 Third Avenue, Suite 16C, New York, NY 10022.

20. Seacor is nominally owned by Lisa Ficarra but is managed by her husband, Charles Divillio ("Divillio").

21. In 2006, Divillio was convicted of Conspiracy to commit Securities fraud in the Eastern

District of New York and sentenced to five months in prison.

22.     Sky Direct, LLC ("Sky Direct"), is a New York limited liability company that maintains its principal office and place of business at 850 Third Avenue, Suite 16C, New York, NY 10022.

23.     Sky Direct is nominally owned by Darlene Pergola and managed by her husband Steven Apolant ("Apolant").

24.     In 2004 the SEC filed securities fraud charges against Apolant.

25.     Apolant has been barred by state authorities in Georgia and New Jersey from participating in the sale of securities in those states.

26.     Southridge, Livingston, Seacor and Sky Direct all share offices at 850 Third Avenue, Suite 16C, New York, NY 10022.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332, as complete diversity exists between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

28.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) as this is a judicial district in which a substantial part of the events or omissions giving rise to the dispute have occurred.

## FACTUAL BACKGROUND

### First Debenture

29.     On November 3, 2009, Cimarron entered a debenture (the "First Debenture") with Enzolytics' predecessor-in-interest, Extreme Mobile Coatings Worldwide Corp. A true and correct copy of the First Debenture is attached as Exhibit A.

30.     Under the terms of the First Debenture, Cimarron provided approximately $100,000.00 at an 8% annual interest rate to Enzolytics in exchange for its promise to pay the accumulated principal and interest under the First Debenture.

31.     Under the First Debenture terms, Cimarron had the option convert the First Debenture into shares of Enzolytics' common stock.

32.     The First Debenture did not impose any time limit on Cimarron's exercise of its right to convert.

33.     The First Debenture provided that no "delay or failure to exercise any right" by Cimarron would waive Cimarron's right to pursue payment or convert the shares.

34.     Enzolytics expressly "waive[d] …. any and all delays or lack of diligence in collection" of the First Debenture "and assent[ed] to each and every extension or postponement of the time of payment or other indulgence."

### Second Debenture

35.     Cimarron entered a second debenture (the "Second Debenture" and together, with the First Debenture, the "Cimarron Debentures") with Enzolytics on January 11, 2010. A true and correct copy of the Second Debenture is attached as Exhibit B.

36.     Under the terms of the Second Debenture, Cimarron provided approximately $50,000 at an 8% annual interest rate to Enzolytics in exchange for its promise to pay the accumulated principal and interest due.

37.     Under the Second Debenture terms, Cimarron had the option convert the Second Debenture into shares of Enzolytics common stock in lieu of demanding payment.

38.     The Second Debenture did not impose any time limit on Cimarron's exercise of its right to convert.

39.     The Second Debenture provided that no "delay or failure to exercise any right" by Cimarron would waive Cimarron's right to pursue payment or convert the shares.

40.     Enzolytics expressly "waive[d] … any and all delays or lack of diligence in collection" of the Second Debenture "and assent[ed] to each and every extension or postponement of the time of payment or other indulgence."

### The Section 251(g) Merger

41.     On or about November 19, 2020, Enzolytics purported to effect a reorganization of its corporate structure pursuant to Delaware General Corporation Law (the "Merger").

42.     Prior to the Merger, in 2017, Sky Direct and Seacor approached Enzolytics through Ray and Zhabilov to create debt in the company and create other classes of stock on extremely favorable terms.

43.     These terms were unfavorable to the common shareholders and existing convertible debtholders such as Cimarron without approval or notice.

44.     From 2017 through 2019, Enzolytics issued approximately 24 debentures to Seacor, 15 debentures to Sky Direct, and one debenture to Southridge (the "Seacor/Sky Direct/Southridge Debentures").

45.     The Seacor/Sky Direct/Southridge Debentures were similar to the Cimarron Debentures, albeit with more favorable terms.

46.     Sky Direct and Seacor and their undisclosed ownership and control persons used these transactions as a reserve bank to buy below market shares and then sell them at higher prices, then buying more shares back from Livingston and also selling them into the markets, to only reinvest the sale proceeds back into the Enzolytics, in effect an illegal Statutory Underwriting.

47.     Beginning in or around May 2020, Cimarron contacted Enzolytics, Inc. about providing additional funding to Enzolytics.

48.     On October 5, 2020, CEO Cotropia suggested a call between himself, Ray and Cimarron. *See* Exhibit C.

49.     On October 9, 2020, CEO Cotropia, Ray and Cimarron discussed the financing projects.

50.     On October 27, 2020, Ray emailed Cimarron, copying CEO Cotropia and Zhabilov, wherein he, on behalf of ENZC informed Cimarron that:

a.     CEO Cotropia and Zhabilov stated that Ray was to "handle" the funding issues;

5

b.    The company did not have any immediate need for additional funding, but suggested the company would review terms for funding in the near future;

c.    Cimarron should tender a term sheet and proposed take-out funding; and

d.    Ray should be copied on all future communications from Cimarron to Enzolytics.

*See* Exhibit D.

51.    On November 14, 2020, Cimarron provided Enzolytics notice through Ray for conversion of the Cimarron Note. *See* Exhibit E.

52.    On November 15, 2020, Cimarron reiterated its notice to Enzolytics through Ray for conversion of the Cimarron Note. *See* Exhibit F.

53.    On November 15, 2020, Ray informed Cimarron that it was going to have to wait because of his "situation." *See* Exhibit G.

54.    On November 16, 2020, Ray followed up indicating Cimarron would need to provide an opinion letter prior to any conversion and indicating Enzolytics would not be able to initiate any conversions until November 26, at the earliest. *See* Exhibit H.

55.    On or about November 16, 2020, despite Ray informing Cimarron that Enzolytics would not be initiating any conversions until November 26, at the earliest, Enzolytics did, in fact, convert the Seacor/Sky Direct/Southridge Debentures.

56.    The Seacor/Sky Direct/Southridge Debentures were converted with the help, advice, and assistance of Ray.

57.    The Seacor/Sky Direct/Southridge Debentures were converted, while Cimarron's were not, because of the close relationship between the principals of Seacor and Sky Direct and the management team of Ray, Zhabilov and Cotropia.

58.    Enzolytics' intent through Ray's emails of November 14, 15, and 16 was to deceive Cimarron by lulling Aiello into a false sense of security that conversions could not occur until November 26, 2020, at the earliest.

59.     Enzolytics sent Cimarron Ray's emails of November 14, 15, and 16 in order to have Cimarron rely upon the false representations made that conversions could not occur until November 26, 2020, at the earliest.

60.     Cimarron justifiably relied upon the emails Enzolytics sent to it on November 14, 15, and 16 that conversions could not occur until November 26, 2020, at the earliest.

61.     The Merger was consummated on or about November 16, 2020 and insiders were permitted conversions prior to November 26, 2020. *See* Exhibit I.

62.     Enzolytics intentionally strung Cimarron along, including, even, *on the day* the Merger was consummated, in order to avoid conversion under the Cimarron Debentures.

63.     One of the surviving entities from the Merger is Enzolytics, which is a publicly traded biotechnology company.

64.     Debtholders that were permitted conversions were issued shares of common stock in Enzolytics.

65.     Upon information and belief, the Merger was perpetrated fraudulently and for the purpose of depriving shareholders, such as Cimarron, of their standing to bring a derivative action.

**<u>Cimarron has Suffered Monetary Damages</u>**

66.     To date, Enzolytics has refused to convert the Cimarron Debentures into shares of the public company as obligated under the Cimarron Debentures.

67.     If the Cimarron Debentures had been properly converted, Cimarron would have received 30,000,000 shares of Enzolytics common stock.

68.     On or about November 30, 2020, the value of Enzolytics' common stock was approximately $0.11 per share.

69.     Cimarron has suffered monetary damages as a result of Enzolytics failure to convert the Cimarron Debentures into shares of the public company as obligated under the Cimarron Debentures.

70.    Cimarron's Second Amended Counterclaim seeks to recover the monetary damages it suffered as a result of Enzolytics failure to convert the Cimarron Debentures into shares of the public company as obligated under the Cimarron Debentures.

71.    As Cimarron's Second Amended Counterclaim seeks monetary damages, it is not identical to Enzolytics' Complaint which seeks a declaratory judgment.

72.    As it is clear that there is not "a complete identity of factual and legal issues between the [Enzolytics'] complaint and [Kona's Second Amended] counterclaim" they are not redundant. *See Aldens, Inc. v. Packel,* 524 F.2d 38, 52 (3rd Cir. 1975).

## COUNT I

## EQUITABLE ESTOPPEL

73.    Cimarron repeats and realleges the allegations of Paragraphs 1 through 72 above, as if fully set forth herein.

74.    In his communications with Cimarron, Ray held himself out as an officer of ENZC, or, was acting as a *de facto* officer for ENZC.

75.    Ray, in an email where he copied CEO Cotropia and Zhabilov, informed Cimarron that all future communications, including those concerning funding, should be directed to him.

76.    As such, Cimarron formed a reasonable belief that Ray was authorized to communicate with it concerning the conversion of the Cimarron Debentures.

77.    Ray had the authority, or at least held himself out to have the authority, to bind ENZC.

78.    Ray was taking action in the name of ENZC through his communications with Cimarron in November 2020.

79.    ENZC, through Ray, made false representations and concealed material facts from Cimarron in email communications in November of 2020, including that:

    a.    ENZC could not initiate any conversions until November 26, 2020, at the earliest;

    b.    Cimarron would need to provide an opinion letter prior to any conversion; and

8

       c.      Cimarron had to wait to convert the Cimarron Debentures because of Ray's "situation."

80.    At the time these communications were made, Ray, and ENZC, were aware that these statements were false.

81.    At the time these communications were made, Ray, and ENZC, were aware of the real facts, including the following:

       a.      ENZC had planned to and was in the process of effecting a Section 251(g) merger on November 16, 2020;

       b.      ENZC had notified other debtholders that there was going to be a Section 251(g) merger effected on November 16, 2020;

       c.      Other debtholders, namely insiders, were permitted to effect conversions prior to November 26, 2020; and

       d.      Cimarron would be required to tender a notice of conversion promptly, and not in a matter weeks, as represented by Ray.

82.    Meanwhile, other debtholders, including insiders and colleagues of Ray were converted with the help, advice, and assistance of Ray, to include the Seacor/Sky Direct/Southridge Debentures.

83.    The false representations made by Ray on behalf of ENZC were intended to purposefully string Cimarron along until the Merger was consummated in order to avoid conversion under the Cimarron Debentures.

84.    Cimarron's reliance on ENZC's false representations made through Ray was in good faith and justifiable.

85.    Based exclusively on ENZC's false representations, made through Ray, Cimarron changed its position to its disadvantage as Cimarron was deceived into believing that it did not have to promptly submit a notice of conversation.

86.    Cimarron's justifiable reliance upon ENZC's false representations made through Ray

9

caused Cimarron monetary damages.

87.     To date, Enzolytics has refused to issue shares of common stock in the publicly traded company to Cimarron.

88.     By reason of the foregoing, Enzolytics should be equitably estopped from refusing to convert the Cimarron Debentures.

## COUNT II

## FRAUDULENT MISREPRESENTATION

89.     Cimarron repeats and realleges the allegations of Paragraphs 1 through 88 above, as if fully set forth herein.

90.     ENZC, through Ray, misrepresented material facts to Cimarron in email communications in November of 2020, including that:

    a.     ENZC could not initiate any conversions until November 26, 2020, at the earliest;

    b.     Cimarron would need to provide an opinion letter prior to any conversion; and

    c.     Cimarron had to wait to convert the Cimarron Debentures because of Ray's "situation."

91.     At the time these communications were made, Ray, and ENZC, were aware that these statements were false.

92.     The misrepresentations made by ENZC were made for the purpose of inducing Cimarron to rely on them so that Cimarron would fail to provide for timely notice of conversion, and so that ENZC could avoid conversion under the Cimarron Debentures.

93.     Cimarron's reliance on ENZC's false representations made through Ray was in good faith and justifiable.

94.     Based exclusively on ENZC's false representations, made through Ray, Cimarron changed its position to its disadvantage as Cimarron was deceived to believe that it did not have to promptly submit a notice of conversation.

95.    Cimarron's justifiable reliance upon ENZC's false representations made through Ray caused Cimarron monetary damages.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Defendant/Counterclaim Plaintiff Cimarron Concepts Inc. prays for judgment as follows:

A.    Denying Plaintiff/Counterclaim Defendant Enzolytics, Inc.'s requests for relief;

B.    Ordering Plaintiff/Counterclaim Defendant Enzolytics, Inc. to convert the Cimarron Debentures into shares of the publicly traded company or to pay Defendant/Counterclaim Plaintiff Cimarron Concept Inc. monetary damages in an amount in excess of $75,000 to be determined at trial;

C.    Awarding Defendant/Counterclaim Plaintiff Cimarron Concepts Inc. pre-judgment interest, attorneys' fees, costs, and expenses; and

D.    Granting Defendant/Counterclaim Plaintiff Cimarron Concepts Inc. such other and further relief in law and equity, as the Court may deem just and proper.

Dated: February 27, 2023                    Respectfully submitted,

*/s/ Kaan Ekiner*
Kaan Ekiner, Esq. (#5607)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
(302) 295-2046
kekiner@cozen.com

John J. Muldoon III, Esq. (admitted *pro hac vice*)
**MULDOON & MULDOON, LLC**
111 West Washington Street
Suite 1500
Chicago, IL 60602
(312) 739-3550
jjm@muldoonlaw.com

*Attorneys for Defendant, Counterclaim*
*Plaintiff Cimarron Concepts, Inc.*

11

# EXHIBIT A



THIS DEBENTURE, AND THE SECURITIES INTO WHICH IT IS CONVERTIBLE (COLLECTIVELY, THE "SECURITIES"), HAVE NOT BEEN REGISTERED WITH THE NOTEED STATES SECURITIES EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE. THE SECURITIES ARE BEING OFFERED PURSUANT TO A SAFE HARBOR FROM REGISTRATION UNDER REGULATION S AND/OR REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMEMDED (THE "ACT"). THE SECURITIES ARE "RESTRICTED" AND MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO U.S. PERSONS (AS SUCH TERM IS DEFINED IN REGULATION S PROMULGATED UNDER THE ACT) UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT, PURSUANT TO REGULATION S AND/OR REGULATION D OR PURSUANT TO AVAILABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND THE COMPANY WILL BE PROVIDED WITH OPINION OF COUNSEL OR OTHER SUCH INFORMATION AS IT MAY REASONABLY REQUIRE TO CONFIRM THAT SUCH EXEMPTIONS ARE AVAILABLE. FURTHER HEDGING TRANSACTION INVOLVING THE SECURITIES MAY NOT BE MADE EXCEPT IN COMPLIANCE WITH THE ACT.

## DEBENTURE

# Extreme Mobile Coatings Worldwide Corp.

$100,000                                                            November 3,
2009

This Debenture is issued by, EXTREME MOBILE COATINGS WORLDWIDE CORP., a Delaware corporation (the "Company"), to Cimarron Capital Ltd. (together with its permitted successors and assigns, the "Holder") pursuant to exemptions from registration under the Securities Act of 1933, as amended.

FOR VALUE RECEIVED, the undersigned, Extreme Mobile Coatings Worldwide Corp. ("Maker"), promises to pay to the order of Cimarron Capital Ltd., or its successors or assigns ("Holder"), on the earlier of (i) Six months from the date of execution, that being May 3, 2010 (ii) or such date as the Maker receives a Notice of Conversion from the Holder, in accordance with the terms and conditions of this Note to convert the amount due to shares of Common Stock of the Maker, or at such other place as the Holder may designate from time to time, in writing, in lawful money of the United States of America, the principal sum of ONE HUNDRED THOUSAND DOLLARS ($100,000) together with interest on the unpaid principal balance of this Note at the rate of EIGHT Percent (8%) per annum.

The Principal and Accrued Interest shall be Payable upon the Maturity Date. The "Maturity Date" shall be the date that is six months from the date of execution of this Note or acceleration due to the occurrence of an Event of Default (as hereinafter defined) or otherwise. Maker shall be entitled to an additional period of thirty-days after the due date to effectuate payment

Each of the following specified events hereby constitutes and is herein referred to individually as an "Event of Default":

(a)     Makers' failure to make or cause to be made any payments to Payee under this Note or under any other note or agreement now existing or hereafter to be entered into between the undersigned and Payee when the same are due; or

(b)     Default in the due and timely observance or performance of the covenants, conditions or agreements of either Maker contained in this Note; or

(c)     If any representation or warranty made by Maker in connection with this transaction or in any document in connection with the instruments, documents and assignments to be executed by Maker hereunder or pursuant hereto shall be untrue in any material respect on the date made.

1.     The principal balance of this Note may be prepaid at any time, and from time to time, at par plus accrued and unpaid interest, at the option of Maker, without premium or penalty.

2.     The delay or failure to exercise any right hereunder shall not waive such right. The undersigned hereby waives demand, presentment, protest, notice of dishonor or nonpayment, notice of protest, any and all delays or lack of diligence in collection hereof and assents to each and every extension or postponement of the time of payment or other indulgence.

3.     If this Note is not paid as hereinbefore provided or should it become necessary in the opinion of the Holder to employ counsel to collect or enforce this Note, maker shall pay to Holder, to the extent permitted by applicable law, all costs, charges, disbursements and attorney's fees incurred by Holder in collecting or enforcing payment thereof, or in protecting the same, whether incurred in or out of court, including appeals and bankruptcy proceedings.

## CONVERSION PROVISIONS

4.     **Exercise of Conversion.**     Upon presentation and surrender of this Convertible Debenture, with a Written Notice of Conversion duly executed, at the principal office of the Company, or any successor principal office of the Company, addressed to the CEO of the Company, the Company shall deliver to the Holder, as promptly as practicable, certificates representing the Conversion Shares being purchased.

5.     **Conversion Price and Shares.**     (a)     Upon notification of Conversion, or calling by the Company, the Holder, shall receive shares of common stock of the Company at a price set forth herein. The amount of shares so determined shall be the "Conversion Shares". In the event of a default in payment, as set forth above, Holder may elect to convert the amount due to Conversion Shares on a TWENTY-FIVE (25%) discount to the thirty-day moving average closing price of the previous day on the date of conversion.

(b)     The Company covenants and agrees that all Shares delivered upon exercise of this Convertible Debenture will, upon delivery, be duly authorized, validly issued, fully paid and non-assessable, and free from all stamp taxes, liens and charges with respect to the purchase

2

thereof. In addition, the Company agrees at all times to reserve and keep available an authorized number of shares of its common stock sufficient to permit the exercise in full of all outstanding warrants. Said Shares shall bear a restrictive legend restricting the transfer or sale of the Conversion shares, subject to Rule 144. The Holder shall have certain rights with respect to registration of the Conversion Shares, as set forth herein.

**6.   Loss or Destruction.** Upon receipt of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Convertible Debenture and, in the case of any such loss, theft or destruction, upon delivery of an indemnification agreement satisfactory in the form and amount to the Company, or in the case of mutilation, upon surrender and cancellation of this Convertible Debenture, the Company, at the Convertible Debenture's expense, will execute and deliver, in lieu thereof, a new Convertible Debenture.

**7.   Rights and Obligations of Convertible Debenture Holder.**   The Holder of this Convertible Debenture shall not, by virtue hereof, be entitled to any rights of a stockholder in the Company, either at law or in equity; provided, however, that upon exercise of the conversion of the Debenture, the Holder shall, for all purposes, be deemed to have become a holder of record of such stock on the date on which this Convertible Debenture, together with a duly executed Notice of Conversion, was surrendered, irrespective of the date of delivery of such share certificate, except that if at the date of surrender of such Convertible Debenture the transfer books for shares of common stock of the Company shall be closed, the Holder of this Convertible Debenture shall not be deemed to have become have become the holder of record of such stock until the date on which such books have been opened, Unless required by law or applicable rule of any national securities exchange such transfer shall not be closed at any one time for a period longer than twenty (20) days. The rights of the Holder of this Convertible Debenture are limited to those expressed herein and the Holder of this Convertible Debenture, by its acceptance hereof, consents to and agrees to be bound by and comply with all the provisions of this Convertible Debenture, including, without limitation, all of the obligations imposed upon the holder in the Convertible Debenture of this Convertible Debenture. In addition, the Holder of this Convertible Debenture, by accepting same, agrees that the Company may, prior to any presentation for registration or transfer, deem and treat the person whose name this Convertible Debenture is registered as the absolute, true and lawful owner for all purposes whatsoever and the Company shall not be affected by any notice to the contrary.

**8.   Disposition of Convertible Debenture or Shares.** (a) The Holder of this Convertible Debenture and any transferee hereof or of the Shares, by their acceptance thereof, hereby agrees that no public distribution of the Convertible Debenture or the Shares will be made in violations of the provisions of the Securities Acts of 1933, as amended, or the Rules and Regulations promulgated thereunder (such act and Rules and Regulations being hereinafter referred to as the "Act"). It shall be a condition to the transfer of this Convertible Debenture that any transferee thereof deliver to the Company his or its written agreement to accept and be bound by all of the terms and conditions of this Convertible Debenture.

(b)   Restrictive Legends. Upon any Conversion, any certificates representing the Shares shall bear the following restrictive legend: The securities represented by certificates have

3

not been registered under the Securities Act of 1933, as amended ("Act"), and may not be offered or sold except pursuant to (i) an effective registration statement under the Act, (ii) to the extent applicable, Rule 144 under the Act (or any similar rule under such Act relating to the disposition of securities), or (iii) an opinion of counsel, if such opinion shall be reasonably satisfactory to counsel to the issuer, that an exemption from registration under such Act is available.

**9.      Adjustments.**

    (a)      Subject and pursuant to the provisions of this Convertible Debenture conversion, shall be subject to adjustment from time to time as follows:

        (i)      If the Company shall hereafter (A) pay a dividend or make a distribution on its common stock, in common stock, or any other shares of stock in the Company or in any other Company, (B) subdivide its outstanding common stock into a greater number of shares, (C) combine its outstanding common stock into a smaller number of shares, or (D) issue any common stock by reclassification of its common stock, then and in such event, there shall be a proportional adjustment in the amount of Conversion Shares and in the number of Conversion Shares issuable upon exercise of each Convertible Debenture so that the registered holder of any Convertible Debenture thereafter exercised shall be entitled to receive the number of shares of common stock, at the same aggregate cost, that he would have received immediately following such action has such Convertible Debenture been exercised immediately prior thereto. Any adjustment made pursuant to this subdivision (i) of this Section of this Convertible Debenture shall become effective immediately after the record date in the event of a dividend or distribution and shall become effective immediately after the effective date in the event of a subdivision, combination or reclassification.

        (ii)      No adjustment in the securities issuable hereunder shall be made unless such adjustment would require an increase or decrease of at least 10% in both the number of shares otherwise issuable. All calculations under this Section "9" of this Convertible Debenture shall be made to the nearest whole share, with a half share being rounded up to a whole share, and in no event shall the Company be obligation to issue fractional shares upon the exercise of any Convertible Debenture.

        (iii)      In the event that as a result of an adjustment made pursuant to subsection (i) of Paragraph "(a)" of this Section of this Convertible Debenture, the registered holder of any Convertible Debenture shall be entitled to receive any securities of the Company other than Conversion Shares, the number of such securities shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions contained in subsections (i) through (iii) of this paragraph "(a)" of this Section of this Convertible Debenture.

    (b)      In the event of (i) any reclassification or change of outstanding Conversion Shares or other securities issuable upon exercise of the Convertible Debenture (other than a change in par value or as a result of a subdivision or combination), or (ii) any consolidation or merger of the Company with or into another corporation or company (other than a merger in which the Company is the continuing corporation and that does not result in any reclassification or change of the then outstanding Conversion Shares or other securities issuable upon conversion of the Convertible Debenture other than a change in par value or subdivision or combination of the Conversion Shares), or (iii) any sale or conveyance to another corporation of all or substantially

4

all of the Company's assets, then, as a condition of such reclassification, change, consolidation, merger, sale or conveyance, the Company, or such successor or purchasing corporation, as the case may be, shall make lawful and adequate provisions whereby the registered holder of each Convertible Debenture then outstanding shall receive, on exercise of such Convertible Debenture, the kind and amount of securities and property receivable upon such number reclassification, change, consolidation, merger, sale or conveyance. Such provisions shall include provision for adjustments that shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section of this Convertible Debenture.

    (c)    Before taking any action that would cause an adjustment increasing the then par value of the Conversion Shares issuable upon exercise of the Convertible Debenture above the Conversion Price, the Company shall have the right to take any corporate action that may, in the opinion of its counsel, be necessary so that the Company may validly and legally issue fully paid and non-assessable shares of common stock at such adjusted Conversion Price.

    (d)    (i)    If at any time the Company shall take any action which would require an adjustment of the Conversion Price, including, but not limited to, (A) the Company shall declare any dividend upon its common stock, payable otherwise than in cash or in common stock of the Company; (B) the Company shall offer for subscription to the holders of its common stock any additional shares of stock of any class or any other securities convertible into shares of stock or any rights to subscribe thereto; (C) there shall be any capital reorganization or reclassification of the capital stock of the Company, or a consolidation or merger of the Company with another corporation (other than a merger in which the Company is the continuing corporation, and which does not result in any reclassification or change of the then outstanding common stock or other capital stock issuable upon exercise of the Convertible Debenture, other than a change in par value or subdivision or combination of such shares); or (D) there shall be a voluntary or involuntary dissolution, liquidation or winding-up of the Company, then, in any one or more of said events, the Company shall cause to be mailed to each of the holders of outstanding Convertible Debenture, at the earliest practicable time (and in any event not less than 20 days before any record date or other date set for definitive action), written notice of the date on which the books of the Company shall close or a record shall be taken for such dividend, distribution of, grant of subscription rights, or such winding up shall take place, as the case may be. Such notice shall also set forth such facts as shall indicate the effect of such action (to the extent such effect may be known at the date of such notice) on the kind and amount of the shares of stock and other securities and property deliverable upon exercise of the Convertible Debenture. Such notice shall also specify the date as of which the record holders of the common stock shall participate in said dividend, distribution, or subscription rights or shall be entitled to exchange their common stock for securities or other property deliverable upon such reorganization, reclassification, sale, consolidation, merger, dissolution, liquidation or winding up, as the case may be (on which date, in the event of a voluntary or involuntary dissolution, liquidation or winding up of the Company, the right to exercise the Convertible Debenture shall terminate).

    (ii)    Without limiting the obligation of the Company to provide notice to the holders of Convertible Debenture of corporate actions hereunder, it is agreed that failure of the Company to give notice shall not invalidate such corporate action of the Company.

    (e)    Although the number of shares of common stock outstanding at any given time shall not include treasury shares, the issuance or sale of any such treasury shares shall be

considered an issuance or sale of common stock for the purposes of this Section "6" of this Convertible Debenture.

(f)    Notwithstanding any provision herein to the contrary, **no** adjustment to either the Conversion Price or the number of Shares or Conversion Shares subject to this Convertible Debenture shall be made pursuant to this Section of this Convertible Debenture upon or by virtue of:

(i)    the issuance or sale by the Company of the Conversion Shares or the exercise of the Convertible Debenture; or

(ii)    the Company's granting of employee stock purchase options or the issuance of common stock pursuant thereto; or

(iii)    the issuance by the Company of any of its securities in connection with the acquisition of another business, company or property.

(g)    Other than as described in 9(a), (b) or (f), if the Company, after the date hereof, shall take any action affecting the shares of its common stock, which, in the good faith opinion of the Board of Directors of the Company, would materially affect the rights of the holder of the Convertible Debenture, then the Conversion Price and the numbers of Conversion Shares obtainable upon exercise of the Convertible Debenture shall be adjusted in such manner, if any, at any such time as the Board of Directors of the Company, may determine to be equitable in the circumstances. Failure of the Board of Directors of the Company to consider (in minutes or a unanimous consent) an adjustment prior to the effective date of any action by the Company affecting the common stock shall be conclusive evidence that the Board of Directors of the Company has determined that no adjustment be made in the circumstances.

(h)    The form of the Convertible Debenture need not be changed because of any change pursuant to this Section of this Convertible Debenture and any Convertible Debenture issued after such change may state the same Conversion Price and the same number of shares as is stated in this Convertible Debenture.

**10.    Reduction of Conversion Price and/or Extension of Conversion Period of Convertible Debentures.**    The Company shall have the right at any time or times, to extend the period in which to exercise such Convertible Debenture upon 20 days' prior written notice to each of the holders of outstanding Convertible Debenture.

**11.    Survival.**    The various rights and obligations of the Holder hereof and of the Company as set forth in this Convertible Debenture shall survive the exercise of the Warrants represented hereby and the surrender of this Convertible Debenture. The Holders of this Convertible Debenture shall, if requested by the Company, deliver to the Company its written acknowledgment of its continuing obligations hereunder.

**12.    Notice.**    All notices required by this Convertible Debenture to be given or made by the Company shall be given or made by first class mail, postage prepaid, addressed to the registered holder hereof at the address of such holder as shown on the books of the Company.

**13.    Successor in Interest.**    The amount due under this Convertible Debenture, and any and all shares shall follow and become the obligation of any successor company in which the

Maker is sold to, merged with or any other combination, including a swap of shares, totaling more than 50% of the issued and outstanding shares of the Maker

14.    **Governing Law.**    This Convertible Debenture shall be governed by and construed and interpreted in accordance with the laws of the State of New York.

      **IN WITNESS HEREOF,** the undersigned has duly executed and delivered this Note as of the date and year first indicated above.

Extreme Mobile Coatings Worldwide Corp.

By: _____

Charles Woodward,
Chairman/CEO

Maker is sold to, merged with or any other combination, including a swap of shares, totaling more than 50% of the issued and outstanding shares of the Maker

14.     **Governing Law.**     This Convertible Debenture shall be governed by and construed and interpreted in accordance with the laws of the State of New York.

    **IN WITNESS HEREOF,** the undersigned has duly executed and delivered this Note as of the date and year first indicated above.

Extreme Mobile Coatings Worldwide Corp.

By:

Charles Woodward,
Chairman/CEO

CIMARRON CAPITAL LTD.                                              339

                                        Date 11-04-09              1-1367/260
                                                                       456

Pay to the
Order of   Extreme Mobile Coating      $ 50,000 00

         Fifty thousand and _____ Dollars

Commerce
Bank  America's Most Convenient Bank
      1-800-YES-2000

For as per loan/ note          Peter J. Aiello

⑈:026013673⑈:   7917842408⑈:   0339

Account: 7917842408
Amount: 50,000.00
PostDate: 20091105
Tran_ID: 504643595
CheckNum: 339
DIN: 504643651



PETER J. AIELLO
108-40 42ND AVE
CORONA, NY, 11368

Date 11-13-09

1-1387/280
458

Pay to the
Order of  Michael Keome Escrow Acct IOLA    $ 50,000 ⁰⁰

Fifty thousand and ————————— Dollars

Commerce
Bank  Open Early,
Open Late

For loan agreement Extreme          Peter Aiello

⑈0 260  36 73⑈    79 1783 4991⑈  0252

Account: 7917834991
Amount: 50,000.00
PostDate: 20091113
Tran_ID: 746367811
CheckNum: 252
DIN: 746367821
ReturnReasonCode:

MEL  0746367821
R008 B26 P0              >211274450<
11/13/2009              TD BANK NA.
71 10:48AM#  11/13/09 11   CHERRY HILL.NJ
On-Us Cashed Check          7917834991
Auburndale                 $50,000.00
                     COLLADDX 04 5456 456

Account: 7917834991
Amount: 50,000.00
PostDate: 20091113
Tran_ID: 746367811
CheckNum: 252
DIN: 746367821

# EXHIBIT B

01/25/2010 15:30 FAX                                                                                  ☑002

THIS DEBENTURE, AND THE SECURITIES INTO WHICH IT IS CONVERTIBLE
(COLLECTIVELY, THE "SECURITIES"), HAVE NOT BEEN REGISTERED WITH THE NOTEED
STATES SECURITIES EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY
STATE. THE SECURITIES ARE BEING OFFERED PURSUANT TO A SAFE HARBOR FROM
REGISTRATION UNDER REGULATION S AND/OR REGULATION D PROMULGATED UNDER
THE SECURITIES ACT OF 1933, AS AMEMDED (THE "ACT"). THE SECURITIES ARE
"RESTRICTED" AND MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO U.S.
PERSONS (AS SUCH TERM IS DEFINED IN REGULATION S PROMULGATED UNDER THE
ACT) UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT, PURSUANT TO
REGULATION S AND/OR REGULATION D OR PURSUANT TO AVAILABLE EXEMPTIONS
FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND THE COMPANY WILL BE
PROVIDED WITH OPINION OF COUNSEL OR OTHER SUCH INFORMATION AS IT MAY
REASONABLY REQUIRE TO CONFIRM THAT SUCH EXEMPTIONS ARE AVAILABLE.
FURTHER HEDGING TRANSACTION INVOLVING THE SECURITIES MAY NOT BE MADE
EXCEPT IN COMPLIANCE WITH THE ACT.

## DEBENTURE

# Extreme Mobile Coatings Worldwide Corp.

$50,000                                                                                  January 11, 2010

This Debenture is issued by, EXTREME MOBILE COATINGS WORLDWIDE
CORP., a Delaware corporation (the Company"), to Cimarron Capital Ltd. (together with
its permitted successors and assigns, the "Holder") pursuant to exemptions from
registration under the Securities Act of 1933, as amended.

FOR VALUE RECEIVED, the undersigned, Extreme Mobile Coatings Worldwide
Corp. ("Maker"), promises to pay to the order of Cimarron Capital Ltd., or its successors or
assigns ("Holder"), on the earlier of (i) Six months from the date of execution, that being June
11, 2010 (ii) or such date as the Maker receives a Notice of Conversion from the Holder, in
accordance with the terms and conditions of this Note to convert the amount due to shares of
Common Stock of the Maker, or at such other place as the Holder may designate from time to
time, in writing, in lawful money of the United States of America, the principal sum of FIFTY
THOUSAND DOLLARS ($50,000) together with interest on the unpaid principal balance of this
Note at the rate of EIGHT Percent (8%) per annum.

The Principal and Accrued Interest shall be Payable upon the Maturity Date. The
"Maturity Date" shall be the date that is six months from the date of execution of this Note or
acceleration due to the occurrence of an Event of Default (as hereinafter defined) or otherwise.
Maker shall be entitled to an additional period of thirty-days after the due date to effectuate
payment

Each of the following specified events hereby constitutes and is herein referred to individually as an "Event of Default":

(a)     Makers' failure to make or cause to be made any payments to Payee under this Note or under any other note or agreement now existing or hereafter to be entered into between the undersigned and Payee when the same are due; or

(b)     Default in the due and timely observance or performance of the covenants, conditions or agreements of either Maker contained in this Note; or

(c)     If any representation or warranty made by Maker in connection with this transaction or in any document in connection with the instruments, documents and assignments to be executed by Maker hereunder or pursuant hereto shall be untrue in any material respect on the date made.

1.     The principal balance of this Note may be prepaid at any time, and from time to time, at par plus accrued and unpaid interest, at the option of Maker, without premium or penalty.

2.     The delay or failure to exercise any right hereunder shall not waive such right.  The undersigned hereby waives demand, presentment, protest, notice of dishonor or nonpayment, notice of protest, any and all delays or lack of diligence in collection hereof and assents to each and every extension or postponement of the time of payment or other indulgence.

3.     If this Note is not paid as hereinbefore provided or should it become necessary in the opinion of the Holder to employ counsel to collect or enforce this Note, maker shall pay to Holder, to the extent permitted by applicable law, all costs, charges, disbursements and attorney's fees incurred by Holder in collecting or enforcing payment thereof, or in protecting the same, whether incurred in or out of court, including appeals and bankruptcy proceedings.

## CONVERSION PROVISIONS

4.     **Exercise of Conversion.**     Upon presentation and surrender of this Convertible Debenture, with a Written Notice of Conversion duly executed, at the principal office of the Company, or any successor principal office of the Company, addressed to the CEO of the Company, the Company shall deliver to the Holder, as promptly as practicable, certificates representing the Conversion Shares being purchased.

5.     **Conversion Price and Shares.**     (a)     Upon notification of Conversion, or calling by the Company, the Holder, shall receive shares of common stock of the Company at a price set forth herein.  The amount of shares so determined shall be the "Conversion Shares".  In the event of a default in payment, as set forth above, Holder may elect to convert the amount due to Conversion Shares on a TWENTY-FIVE (25%) discount to the thirty-day moving average closing price of the previous day on the date of conversion.

(b)     The Company covenants and agrees that all Shares delivered upon exercise of this Convertible Debenture will, upon delivery, be duly authorized, validly issued, fully paid and non-assessable, and free from all stamp taxes, liens and charges with respect to the purchase

2

thereof. In addition, the Company agrees at all times to reserve and keep available an authorized number of shares of its common stock sufficient to permit the exercise in full of all outstanding warrants. Said Shares shall bear a restrictive legend restricting the transfer or sale of the Conversion shares, subject to Rule 144. The Holder shall have certain rights with respect to registration of the Conversion Shares, as set forth herein.

6.     **Loss or Destruction.** Upon receipt of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Convertible Debenture and, in the case of any such loss, theft or destruction, upon delivery of an indemnification agreement satisfactory in the form and amount to the Company, or in the case of mutilation, upon surrender and cancellation of this Convertible Debenture, the Company, at the Convertible Debenture's expense, will execute and deliver, in lieu thereof, a new Convertible Debenture.

7.     **Rights and Obligations of Convertible Debenture Holder.**     The Holder of this Convertible Debenture shall not, by virtue hereof, be entitled to any rights of a stockholder in the Company, either at law or in equity; provided, however, that upon exercise of the conversion of the Debenture, the Holder shall, for all purposes, be deemed to have become a holder of record of such stock on the date on which this Convertible Debenture, together with a duly executed Notice of Conversion, was surrendered, irrespective of the date of delivery of such share certificate, except that if at the date of surrender of such Convertible Debenture the transfer books for shares of common stock of the Company shall be closed, the Holder of this Convertible Debenture shall not be deemed to have become have become the holder of record of such stock until the date on which such books have been opened, Unless required by law or applicable rule of any national securities exchange such transfer shall not be closed at any one time for a period longer than twenty (20) days. The rights of the Holder of this Convertible Debenture are limited to those expressed herein and the Holder of this Convertible Debenture, by its acceptance hereof, consents to and agrees to be bound by and comply with all the provisions of this Convertible Debenture, including, without limitation, all of the obligations imposed upon the holder in the Convertible Debenture of this Convertible Debenture. In addition, the Holder of this Convertible Debenture, by accepting same, agrees that the Company may, prior to any presentation for registration or transfer, deem and treat the person whose name this Convertible Debenture is registered as the absolute, true and lawful owner for all purposes whatsoever and the Company shall not be affected by any notice to the contrary.

8.     **Disposition of Convertible Debenture or Shares.** (a) The Holder of this Convertible Debenture and any transferee hereof or of the Shares, by their acceptance thereof, hereby agrees that no public distribution of the Convertible Debenture or the Shares will be made in violations of the provisions of the Securities Acts of 1933, as amended, or the Rules and Regulations promulgated thereunder (such act and Rules and Regulations being hereinafter referred to as the "Act"). It shall be a condition to the transfer of this Convertible Debenture that any transferee thereof deliver to the Company his or its written agreement to accept and be bound by all of the terms and conditions of this Convertible Debenture.

        (b)     Restrictive Legends. Upon any Conversion, any certificates representing the Shares shall bear the following restrictive legend: The securities represented by certificates have

3

not been registered under the Securities Act of 1933, as amended ("Act"), and may not be offered or sold except pursuant to (i) an effective registration statement under the Act, (ii) to the extent applicable, Rule 144 under the Act (or any similar rule under such Act relating to the disposition of securities), or (iii) an opinion of counsel, if such opinion shall be reasonably satisfactory to counsel to the issuer, that an exemption from registration under such Act is available.

9.    **Adjustments.**

(a)    Subject and pursuant to the provisions of this Convertible Debenture conversion, shall be subject to adjustment from time to time as follows:

(i)    If the Company shall hereafter (A) pay a dividend or make a distribution on its common stock, in common stock, or any other shares of stock in the Company or in any other Company, (B) subdivide its outstanding common stock into a greater number of shares, (C) combine its outstanding common stock into a smaller number of shares, or (D) issue any common stock by reclassification of its common stock, then and in such event, there shall be a proportional adjustment in the amount of Conversion Shares and in the number of Conversion Shares issuable upon exercise of each Convertible Debenture so that the registered holder of any Convertible Debenture thereafter exercised shall be entitled to receive the number of shares of common stock, at the same aggregate cost, that he would have received immediately following such action has such Convertible Debenture been exercised immediately prior thereto. Any adjustment made pursuant to this subdivision (i) of this Section of this Convertible Debenture shall become effective immediately after the record date in the event of a dividend or distribution and shall become effective immediately after the effective date in the event of a subdivision, combination or reclassification.

(ii)    No adjustment in the securities issuable hereunder shall be made unless such adjustment would require an increase or decrease of at least 10% in both the number of shares otherwise issuable. All calculations under this Section "9" of this Convertible Debenture shall be made to the nearest whole share, with a half share being rounded up to a whole share, and in no event shall the Company be obligation to issue fractional shares upon the exercise of any Convertible Debenture.

(iii)    In the event that as a result of an adjustment made pursuant to subsection (i) of Paragraph "(a)" of this Section of this Convertible Debenture, the registered holder of any Convertible Debenture shall be entitled to receive any securities of the Company other than Conversion Shares, the number of such securities shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions contained in subsections (i) through (iii) of this paragraph "(a)" of this Section of this Convertible Debenture.

(b)    In the event of (i) any reclassification or change of outstanding Conversion Shares or other securities issuable upon exercise of the Convertible Debenture (other than a change in par value or as a result of a subdivision or combination), or (ii) any consolidation or merger of the Company with or into another corporation or company (other than a merger in which the Company is the continuing corporation and that does not result in any reclassification or change of the then outstanding Conversion Shares or other securities issuable upon conversion of the Convertible Debenture other than a change in par value or subdivision or combination of the Conversion Shares), or (iii) any sale or conveyance to another corporation of all or substantially

4

all of the Company's assets, then, as a condition of such reclassification, change, consolidation, merger, sale or conveyance, the Company, or such successor or purchasing corporation, as the case may be, shall make lawful and adequate provisions whereby the registered holder of each Convertible Debenture then outstanding shall receive, on exercise of such Convertible Debenture, the kind and amount of securities and property receivable upon such number reclassification, change, consolidation, merger, sale or conveyance. Such provisions shall include provision for adjustments that shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section of this Convertible Debenture.

(c)     Before taking any action that would cause an adjustment increasing the then par value of the Conversion Shares issuable upon exercise of the Convertible Debenture above the Conversion Price, the Company shall have the right to take any corporate action that may, in the opinion of its counsel, be necessary so that the Company may validly and legally issue fully paid and non-assessable shares of common stock at such adjusted Conversion Price.

(d)     (i)     If at any time the Company shall take any action which would require an adjustment of the Conversion Price, including, but not limited to, (A) the Company shall declare any dividend upon its common stock, payable otherwise than in cash or in common stock of the Company; (B) the Company shall offer for subscription to the holders of its common stock any additional shares of stock of any class or any other securities convertible into shares of stock or any rights to subscribe thereto; (C) there shall be any capital reorganization or reclassification of the capital stock of the Company, or a consolidation or merger of the Company with another corporation (other than a merger in which the Company is the continuing corporation, and which does not result in any reclassification or change of the then outstanding common stock or other capital stock issuable upon exercise of the Convertible Debenture, other than a change in par value or subdivision or combination of such shares); or (D) there shall be a voluntary or involuntary dissolution, liquidation or winding-up of the Company, then, in any one or more of said events, the Company shall cause to be mailed to each of the holders of outstanding Convertible Debenture, at the earliest practicable time (and in any event not less than 20 days before any record date or other date set for definitive action), written notice of the date on which the books of the Company shall close or a record shall be taken for such dividend, distribution of, grant of subscription rights, or such winding up shall take place, as the case may be. Such notice shall also set forth such facts as shall indicate the effect of such action (to the extent such effect may be known at the date of such notice) on the kind and amount of the shares of stock and other securities and property deliverable upon exercise of the Convertible Debenture. Such notice shall also specify the date as of which the record holders of the common stock shall participate in said dividend, distribution, or subscription rights or shall be entitled to exchange their common stock for securities or other property deliverable upon such reorganization, reclassification, sale, consolidation, merger, dissolution, liquidation or winding up, as the case may be (on which date, in the event of a voluntary or involuntary dissolution, liquidation or winding up of the Company, the right to exercise the Convertible Debenture shall terminate).

(ii)     Without limiting the obligation of the Company to provide notice to the holders of Convertible Debenture of corporate actions hereunder, it is agreed that failure of the Company to give notice shall not invalidate such corporate action of the Company.

(e)     Although the number of shares of common stock outstanding at any given time shall not include treasury shares, the issuance or sale of any such treasury shares shall be

5

considered an issuance or sale of common stock for the purposes of this Section "6" of this Convertible Debenture.

    (f)    Notwithstanding any provision herein to the contrary, **no** adjustment to either the Conversion Price or the number of Shares or Conversion Shares subject to this Convertible Debenture shall be made pursuant to this Section of this Convertible Debenture upon or by virtue of:

    (i)    the issuance or sale by the Company of the Conversion Shares or the exercise of the Convertible Debenture; or

    (ii)    the Company's granting of employee stock purchase options or the issuance of common stock pursuant thereto; or

    (iii)    the issuance by the Company of any of its securities in connection with the acquisition of another business, company or property.

    (g)    Other than as described in 9(a), (b) or (f), if the Company, after the date hereof, shall take any action affecting the shares of its common stock, which, in the good faith opinion of the Board of Directors of the Company, would materially affect the rights of the holder of the Convertible Debenture, then the Conversion Price and the numbers of Conversion Shares obtainable upon exercise of the Convertible Debenture shall be adjusted in such manner, if any, at any such time as the Board of Directors of the Company, may determine to be equitable in the circumstances. Failure of the Board of Directors of the Company to consider (in minutes or a unanimous consent) an adjustment prior to the effective date of any action by the Company affecting the common stock shall be conclusive evidence that the Board of Directors of the Company has determined that no adjustment be made in the circumstances.

    (h)    The form of the Convertible Debenture need not be changed because of any change pursuant to this Section of this Convertible Debenture and any Convertible Debenture issued after such change may state the same Conversion Price and the same number of shares as is stated in this Convertible Debenture.

**10.    Reduction of Conversion Price and/or Extension of Conversion Period of Convertible Debentures.**    The Company shall have the right at any time or times, to extend the period in which to exercise such Convertible Debenture upon 20 days' prior written notice to each of the holders of outstanding Convertible Debenture.

**11.    Survival.**    The various rights and obligations of the Holder hereof and of the Company as set forth in this Convertible Debenture shall survive the exercise of the Warrants represented hereby and the surrender of this Convertible Debenture. The Holders of this Convertible Debenture shall, if requested by the Company, deliver to the Company its written acknowledgment of its continuing obligations hereunder.

**12.    Notice.**    All notices required by this Convertible Debenture to be given or made by the Company shall be given or made by first class mail, postage prepaid, addressed to the registered holder hereof at the address of such holder as shown on the books of the Company.

**13.    Successor in Interest.**    The amount due under this Convertible Debenture, and any and all shares shall follow and become the obligation of any successor company in which the

6

Maker is sold to, merged with or any other combination, including a swap of shares, totaling more than 50% of the issued and outstanding shares of the Maker

14.    **Governing Law.**    This Convertible Debenture shall be governed by and construed and interpreted in accordance with the laws of the State of New York.

IN WITNESS HEREOF, the undersigned has duly executed and delivered this Note as of the date and year first indicated above.

Extreme Mobile Coatings Worldwide Corp.

By: _____

Charles Woodward,
Chairman/CEO

358

CIMARRON CAPITAL LTD.

1-1367/260
456

1-15-10
Date

Pay to the
Order of   Michael Krone (Escrow) Accl.   $ 50,000.00

Fifty thousand and ————————   Dollars

Security
Feature
Details on
Back.

**TD Bank**

America's Most Convenient Bank®

For   loan Agreement (EHWW)   Peter J Aiello   NP

⑆026013673⑆ 7917842408⑈   0358

Account: 7917842408
Amount: 50,000.00
PostDate: 20100115
Tran_ID: 541734176
CheckNum: 358
DIN: 541734181

# EXHIBIT C

**csc@bioclonetics.com** <csc@bioclonetics.com>      Mon, Oct 5, 2020 at 5:21 PM
To: Robert du Purton <rdupurton@gmail.com>
Cc: Harry Zhabilov <zhabilov@att.net>, peter aiello <peteraiello29@gmail.com>

Hi Robert,

The weekend was good. Hope your weekend went well also.

A discussion this Wednesday at 10 am EST would be good. We are getting a lot of interest from various groups and would like to know what you would propose.

We will ask Billy Ray to be on the call if that is OK with you and Peter.

We can use our call-in number unless you would prefer to use yours.

     Conference call in – 978 990-5139

     Code 8899670.

Look forward to the discussion. If you need any additional information from us before the call, please let us know.

Best regards,

Charles

# EXHIBIT D

 **Gmail**

**peter aiello <peteraiello29@gmail.com>**

---

## Term sheet
1 message

---

**Billy Ray <billyvrayjr@yahoo.com>**　　　　　　　　　Tue, Oct 27, 2020 at 12:23 PM
To: Peter Aiello <peteraiello29@gmail.com>
Cc: Charles Cotropia <csc@bioclonetics.com>, Harry Zhabilov <zhabilov@att.net>

Peter,

Charles has sent me the text you just sent him. I am sorry that I am not communicating the position clearly. Charles and Harry have asked me to handle the funding responses. The company is not interested in a consultant/agent situation. We have plenty of consultants. The company has $500K in bridge funding so the immediate needs are met. The merged entity will need additional funding, which the bridge lenders are also providing terms for $3 million. You and I have discussed the next steps being the Company need a terms sheet of what your group is willing to provide. The company is not going to provide the terms they are negotiating with the bridge lender but will listen to the terms you are wiling to offer. If you would rather wait until the current proposed funding is complete and then offer take out financing that is an option as well.

Please make sure that all future communications are copied to me. We hope we can find a way to complete a transaction with you based on terms received from your group but we can't disclose the terms we are negotiating as the bridge loan has a confidentiality clause in it.

Call if you need to.

Thanks,

Billy

# EXHIBIT E

 **Gmail**

peter aiello <peteraiello29@gmail.com>

# Conversion of a portion of my debts
6 messages

---

**peter aiello** <peteraiello29@gmail.com>                              Sat, Nov 14, 2020 at 9:39 AM
To: Harry Zhabilov <zhabilov@att.net>, billyvrayjr@yahoo.com
Cc: Naomi Alzate <naomi.alzate@gmail.com>, Peter Aiello <peteraiello29@gmail.com>

Dear Harry/Billy,
This is a request to Enzolytics, Inc., that I desire to convert a portion of my debts, into
common shares of Enzolytics,Inc.
Based, on the Sept.30,2018 Quarterly Filing, Cimarron Capital, Ic. has (2) outstanding
loans, and my other corporation Kona Concepts, Inc has (1) Loan Agreement.
Following are the (2) Loan Agreements I have decided to convert.

Kona Concepts, Inc. on the above date of the Quarterly Filing shows,
Principal.          Interest.          Total
$25,000            $4,664            $29,664     *Plus (2) year interest @ 8% = $35,000

Kona Concepts, Inc. $35,000 @ the (50%) discount ($.004) Equates into  8,775,000

Cimarron Capital,Ltd
Principal.          Interest          Total
$5,000.            $800.            $5800       *Plus (2) year interest @ 8% = $6765
Cimarron Capital Ltd. $5,800 @ the (50%) Discount ($.004)  equates Into  1,675,000

Based on the Terms of both loans, I have the option to convert my debt at a (50%)
discount to the lowest closing bid during the last 10 days.
In the last 10 days, the lowest closing bid  price of Enzolytics (ENZC) was $.008, which
would at a (50%) discount convert at ($.004)

Please send me whatever document, or paperwork you require to expedite this
transaction.
Best Regards,
Peter

* I have calculated the approximate interest that would be accumulated up to date

Sent from my iPad

---

**peter aiello** <peteraiello29@gmail.com>                              Sun, Nov 15, 2020 at 5:04 AM
To: Harry Zhabilov <zhabilov@att.net>, billyvrayjr@yahoo.com

# EXHIBIT F

**peter aiello** <peteraiello29@gmail.com>                    Sun, Nov 15, 2020 at 5:04 AM
To: Harry Zhabilov <zhabilov@att.net>, billyvrayjr@yahoo.com

Dear Harry/Billy,
I seemed to make an error in the enclosed email sent.
As relates to the Cimarron Capital, Ltd combined principal and
interest, I mistakenly put the total amount as $5800, which
should have reflected $6765.
Based on the $6765 amount owed, that is where I calculated
the amount of shares
would equate to the number as it appears in my email sent is
the 1,675,000.
Hopefully, my emails will be sufficient evidence of my request
to the enclosed conversion of the portion of the debts owed.
Regards,
Peter
Sent from my iPad

# EXHIBIT G

**Billy Ray** <billyvrayjr@yahoo.com>                    Sun, Nov 15, 2020 at 8:37 AM
Reply-To: "billyvrayjr@yahoo.com" <billyvrayjr@yahoo.com>
To: "peteraiello29@gmail.com" <peteraiello29@gmail.com>, Harry Zhabilov
<zhabilov@att.net>

Peter,

You are going to have to wait. It is like you are not hearing me or ignoring my situation.
Harry would need my help and I can't give it right now. Hopefully later this week but it is
worse today.

Billy

Sent from Yahoo Mail on Android
[Quoted text hidden]

# EXHIBIT H

**Billy Ray** <billyvrayjr@yahoo.com>                    Mon, Nov 16, 2020 at 12:57 PM
Reply-To: "billyvrayjr@yahoo.com" <billyvrayjr@yahoo.com>
To: "peteraiello29@gmail.com" <peteraiello29@gmail.com>

Peter,

I am still working from a flat on my back position from my phone. The first thing I see is that you ar cal ulating interey that had already been accrued. The accrued interest on the disclosure statement is the life of the loan accrual. So you do jot need to calculate interest.

I have a call into Tiffany to confirm but based on my past experience you will have to have an opinion letter. Next I have to finish the filings to remove the stop sign before an attorney will issue an opinion letter and fi ally if you look at the press release around October 26th the initial funding required the company to stand still for 30 days on any conversions. Earliest tou could get this done is 11-26 but at the pace Jona is turning the qtrs iymt will probably be 12-10 before everything is filed including the opinion letter.

Hope this helps. █████████████████████████████████
█████

Thanks,

Billy

# EXHIBIT I

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:09 PM 11/19/2020
FILED 04:09 PM 11/19/2020
SR 20208450588 - File Number 4658525

CERTIFICATE OF MERGER
Enzolytics, Inc.,
Enzolytics Merger Corp. and
ENZC SUB, Inc.

Pursuant to Section 251 of the General Corporation Law of the State of Delaware (the "DGCL"), Enzolytics, Inc., a Delaware corporation, in connection with the merger of Enzolytics Merger Corp., a Delaware corporation, with and into ENZC SUB, Inc. (this being hereinafter referred to as the "Merger"), hereby certifies as follows:

FIRST: The names and states of incorporation of the constituent corporations to the Merger are:

| Name | State of Incorporation |
|---|---|
| Enzolytics, Inc. | Delaware |
| ENZC SUB, Inc. | Delaware |
| Enzolytics Merger Corp. | Delaware |

SECOND: An Agreement and Plan of Merger, dated as of November 16, 2020, by and among Enzolytics, Inc., ENZC SUB, Inc., and Enzolytics Merger Corp. (the "Merger Agreement"), setting forth the terms and conditions of the Merger, has been approved, adopted, executed and acknowledged by each of the three participants to such Merger Agreement, in accordance with Section 251(g) of the DGCL.

THIRD: The name of the surviving corporation is ENZC SUB, Inc. (the "Surviving Corporation"), with Enzolytics Merger Corp. not surviving, with ENZC SUB, Inc. continuing in existence as the subsidiary of Enzolytics, Inc., the successor issuer.

FOURTH: The Certificate of Incorporation, as may be amended from time to time of the Corporation as in effect immediately prior to the Merger shall be the certificate of incorporation of the Surviving Corporation with the addition of a new Article, which shall be added thereto, reading as follows:

> "Other than the election or removal of directors of the Corporation, any act or transaction by or involving the Corporation that requires for its adoption under the General Corporation Law of the State of Delaware or this Certificate of Incorporation, as may be amended from time to time the approval of the stockholders of the Corporation shall, pursuant to Section 251(g)(7)(i) of the General Corporation Law of the State of Delaware, require, in addition, the approval of the stockholders of the Corporation (or any successor by merger), by the same vote as is required by the General Corporation Law of the State of Delaware and/or this Certificate of Incorporation, as may be amended from time to time."

FIFTH: The Merger shall become effective upon filing.

SIXTH: The executed Merger Agreement is on file at the office of the Surviving Corporation located at 2000 North Central Expressway, Plano, Texas 75074. A copy of the Merger

Agreement will be furnished by the Surviving Corporation, on request and without cost to any stockholder of either corporation.

SEVENTH: Following the Merger and its effectiveness, Enzolytics, Inc. will become the parent corporation to ENZC SUB, Inc. and its sole shareholder, with Enzolytics Merger Corp. ceasing to exist.

IN WITNESS WHEREOF, this Certificate of Merger has been executed on this November 16, 2020.

**Enzolytics, Inc.,**
a Delaware corporation

Name:               Charles Cotropia, CEO and President


**ENZC SUB, Inc.,**
a Delaware corporation

Name:               Charles Cotropia, CEO and President


**Enzolytics Merger Corp.,**
a Delaware corporation

Name:               Charles Cotropia, CEO and President

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|   |   |
|---|---|
| ENZOLYTICS, INC., | |
| Plaintiff, | |
| v. | C.A. No.: 21-1600-RGA |
| KONA CONCEPTS, INC., | |
| Defendant. | |

## DEFENDANT/COUNTERCLAIM PLAINTIFF KONA CONCEPTS, INC.'S SECOND AMENDED COUNTERCLAIM

Defendant/Counterclaim Plaintiff, Kona Concepts, Inc., by and through its undersigned counsel, brings this Second Amended Counterclaim against Plaintiff/Counterclaim Defendant, Enzolytics, Inc. and states as follows:

## PARTIES

1.      Kona Concepts, Inc. ("Kona") is a corporation duly formed in Nevada that maintains its principal office and place of business in Boca Raton, Florida.

2.      Peter Aiello ("Aiello") is an individual residing in the State of Florida.

3.      Aiello is the sole shareholder of Kona.

4.      At all times relevant, Aiello was a shareholder of Enzolytics, Inc.

5.      Enzolytics, Inc. was incorporated in Delaware in 2004 as "T&T Homes Limited." The entity's name changed several times over the years. As relevant here, the entity changed its name on the following dates: in March 2009, to Extreme Mobile Coatings Worldwide Corp.; in November 2012, to Eco-Petroleum Solutions, Inc.; in January 2018, to Enzolytics, Inc.; at some point prior to November 16, 2020, to ENZC SUB, Inc. Enzolytics, Inc. and its predecessors will hereinafter be referred to as "Enzolytics" or "ENZC."

1

6. Billy V. Ray ("Ray") is an individual and, upon information and belief, an officer, or *de facto* officer of Enzolytics.

7. Up until the events relevant to this counterclaim, Aiello and Ray were close personal friends.

8. In 2014, Ray was convicted of Securities Fraud in the United States District Court for the Southern District for the Southern of Florida and sentenced to eight months in prison.

9. In 2014, Ray was permanently enjoined from acting as an officer or director of publicly traded companies such as Enzolytics.

10. Harry Zhabilov ("Zhabilov") is an individual and an officer of Enzolytics.

11. Up until the events relevant to this counterclaim, Aiello and Zhabilov were close personal friends.

12. Charles Cotropia ("Cotropia") is an individual and the Chief Executive Officer ("CEO") of Enzolytics.

13. Livingston Asset Management ("Livingston") is a Florida limited liability company that maintains its principal office and place of business in the State of Florida.

14. Livingston also has an office at 850 Third Avenue, Suite 16C, New York, NY 10022.

15. Livingston is owned and managed by Steven Hicks ("Hicks").

16. Southridge Partners II ("Southridge") is a Delaware general partnership.

17. Hicks is also the manager of Southridge.

18. In August 2017, the United States District Court for the District of Connecticut entered judgment against Hicks and Southridge in excess of $5,000,000 for misappropriation of clients' funds.

19.     Seacor Capital Inc. ("Seacor") is a New York corporation that maintains its principal office and place of business at 850 Third Avenue, Suite 16C, New York, NY 10022.

20.     Seacor is nominally owned by Lisa Ficarra but is managed by her husband, Charles Divillio ("Divillio").

21.     In 2006, Divillio was convicted of Conspiracy to commit Securities fraud in the Eastern District of New York and sentenced to five months in prison.

22.     Sky Direct, LLC ("Sky Direct"), is a New York limited liability company that maintains its principal office and place of business at 850 Third Avenue, Suite 16C, New York, NY 10022.

23.     Sky Direct is nominally owned by Darlene Pergola and managed by her husband Steven Apolant ("Apolant").

24.     In 2004 the SEC filed securities fraud charges against Apolant.

25.     Apolant has been barred by state authorities in Georgia and New Jersey from participating in the sale of securities in those states.

26.     Southridge, Livingston, Seacor and Sky Direct all share offices at 850 Third Avenue, Suite 16C, New York, NY 10022.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332, as complete diversity exists between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

28.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) as this is a judicial district in which a substantial part of the events or omissions giving rise to the dispute have occurred.

## FACTUAL BACKGROUND

### Kona Note

29.     On March 9, 2017, Kona entered a 12% Convertible Promissory Note (the "Kona Note") with Enzolytics, Inc.'s predecessor-in-interest, Eco-Petroleum Solutions, Inc. A true and correct copy of the Kona Note is attached as Exhibit A.

30.     Under the terms of the Kona Note, Kona provided approximately $25,000.00 at an 12% annual interest rate to Enzolytics in exchange for its promise to pay the accumulated principal and interest under the Kona Note.

31.     Under the Kona Note terms, Kona had sole discretion to elect to convert the Note into shares of ENZC common stock.

32.     The Kona Note did not impose any time limit on Kona's exercise of its right to convert.

33.     The Kona Note provided that Enzolytics "waives presentment, demand for performance, notice or non-performance, protest, notice of protest and notice of dishonor."

34.     The Kona Note also provided that no "delay on the part of the holder in exercising any right hereunder" by Kona would waive Kona's right to pursue payment or convert the shares.

### The Section 251(g) Merger

35.     On or about November 16, 2020, Enzolytics purported to effect a reorganization of its corporate structure pursuant to Delaware General Corporation Law (the "Merger").

36.     Prior to the Merger, in 2017, Sky Direct and Seacor approached Enzolytics through Ray and Zhabilov to create debt in the company and create other classes of stock on extremely favorable terms.

37.     These terms were unfavorable to the common shareholders and existing convertible debtholders such as Kona without approval or notice.

38.     From 2017 through 2019, Enzolytics issued approximately 24 notes to Seacor, 15 notes to Sky Direct, and one note to Southridge (the "Seacor/Sky Direct/Southridge Notes").

39.     The Seacor/Sky Direct/Southridge Notes were similar to the Kona Note, albeit with more favorable terms.

40.     Sky Direct and Seacor and their undisclosed ownership and control persons used these transactions as a reserve bank to buy below market shares and then sell them at higher prices, then buying more shares back from Livingston and also selling them into the markets, to only reinvest the sale proceeds back into the Enzolytics, in effect an illegal Statutory Underwriting.

41.     Beginning in or around May 2020, Kona contacted Enzolytics, Inc. about providing additional funding to Enzolytics.

42.     On October 5, 2020, CEO Cotropia suggested a call between himself, Ray and Kona. *See* Exhibit B.

43.     On October 9, 2020, CEO Cotropia, Ray and Kona discussed the financing projects.

44.     On October 27, 2020, Ray emailed Kona, copying CEO Cotropia and Zhabilov, wherein he, on behalf of ENZC informed Kona that:

    a.     CEO Cotropia and Zhabilov stated that Ray was to "handle" the funding issues;

    b.     The company did not have any immediate need for additional funding, but suggested the company would review terms for funding in the near future;

    c.     Kona should a tender term sheet and proposed take-out funding; and

    d.     Ray should be copied on all future communications from Kona to Enzolytics.

*See* Exhibit C.

45.     On November 14, 2020, Kona provided Enzolytics notice through Ray for

5

conversion of the Kona Note. *See* Exhibit D.

46.    On November 15, 2020, Kona reiterated its notice to Enzolytics through Ray that for conversion of the Kona Note. *See* Exhibit E.

47.    On November 15, 2020, Ray informed Kona that it was going to have to wait because of his "situation." *See* Exhibit F.

48.    On November 16, 2020, Ray followed up indicating Kona would need to provide an opinion letter prior to any conversion and indicating Enzolytics would not be able to initiate any conversions until November 26, at the earliest. *See* Exhibit G.

49.    On or about November 16, 2020, despite Ray informing Kona that Enzolytics would not be initiating any conversions until November 26, at the earliest, Enzolytics did, in fact, convert the Seacor/Sky Direct/Southridge Notes.

50.    The Seacor/Sky Direct/Southridge Notes were converted with the help, advice, and assistance of Ray.

51.    The Seacor/Sky Direct/Southridge Notes were converted, while Kona's were not, because of the close relationship between the principals of Seacor and Sky Direct and the management team of Ray, Zhabilov and Cotropia.

52.    Enzolytics' intent through Ray's emails of November 14, 15, and 16 was to deceive Kona by lulling Aiello into a false sense of security that conversions could not occur until November 26, 2020, at the earliest.

53.    Enzolytics sent Kona Ray's emails of November 14, 15, and 16 in order to have Kona rely upon the false representations made that conversions could not occur until November 26, 2020, at the earliest.

54.    Kona justifiably relied upon the emails Enzolytics sent to it on November 14, 15,

and 16 that conversion could not occur until November 26, 2020, at the earliest.

55.     The Merger was consummated on or about November 16, 2020 and insiders were permitted conversions prior to November 26, 2020. *See* Exhibit H.

56.     Enzolytics intentionally strung Kona along, including, even, *on the day* the Merger was consummated, in order to avoid conversion under the Kona Note.

57.     One of the surviving entities from the Merger is Enzolytics, which is a publicly traded biotechnology company.

58.     Debtholders that were permitted conversions were issued shares of common stock in Enzolytics.

59.     Upon information and belief, the Merger was perpetrated fraudulently and for the purpose of depriving shareholders, such as Kona, of their standing to bring a derivative action.

### Kona has Suffered Monetary Damages

60.     To date, Enzolytics has refused to convert the Kona Note into shares of the public company as obligated under the Kona Note.

61.     If the Kona Note had been properly converted, Kona would have received 9,703,720 shares of Enzolytics common stock.

62.     On or about November 30, 2020, the value of Enzolytics' common stock was approximately $0.11 per share.

63.     Kona has suffered monetary damages as a result of Enzolytics' failure to convert the Kona Note into shares of the public company as obligated under the Kona Note.

64.     Kona's Second Amended Counterclaim seeks to recover the monetary damages it suffered as a result of Enzolytics' failure to convert the Kona Note into shares of the public company as obligated under the Kona Note.

65.     As Kona's Second Amended Counterclaim seeks monetary damages, it is not

identical to Enzolytics' Complaint which seeks a declaratory judgment.

66.     As it is clear that there is not "a complete identity of factual and legal issues between [Enzolytics'] complaint and [Kona's Second Amended] counterclaim[,]" they are not redundant. *See Aldens, Inc. v. Packel,* 524 F.2d 38, 52 (3rd Cir. 1975).

**COUNT I**

**EQUITABLE ESTOPPEL**

67.     Kona repeats and realleges the allegations of Paragraphs 1 through 66 above, as if fully set forth herein.

68.     In his communications with Kona, Ray held himself out as an officer of ENZC, or, was acting as a *de facto* officer for ENZC.

69.     Ray, in an email where he copied CEO Cotropia and Zhabilov, informed Kona that all future communications, including those concerning funding, should be directed to him.

70.     As such, Kona formed a reasonable belief that Ray was authorized to communicate with it concerning the conversion of the Kona Note.

71.     Ray had the authority, or at least held himself out to have the authority, to bind ENZC.

72.     Ray was taking action in the name of ENZC through his communications with Kona in November 2020.

73.     ENZC, through Ray, made false representations and concealed material facts from Kona in email communications in November of 2020, including that:

      a.     ENZC could not initiate any conversions until November 26, 2020, at the earliest;

      b.     Kona would need to provide an opinion letter prior to any conversion; and

      c.     Kona had to wait to convert the Kona Note because of Ray's "situation."

8

74. At the time these communications were made, Ray, and ENZC, were aware that these statements were false.

75. At the time these communications were made, Ray, and ENZC, were aware of the real facts, including the following:

    a. ENZC had planned to and was in the process of effecting a Section 251(g) merger on November 16, 2020;

    b. ENZC had notified other debtholders that there was going to be a Section 251(g) merger effected on November 16, 2020;

    c. Other debtholders, namely insiders, were permitted to effect conversions prior to November 26, 2020; and

    d. Kona would be required to tender a notice of conversion promptly, and not in a matter of weeks, as represented by Ray.

76. Meanwhile, other debtholders, including insiders and colleagues of Ray were converted with the help, advice, and assistance of Ray, to include the Seacor/Sky Direct/Southridge Debentures.

77. The false representations made by Ray on behalf of ENZC were intended to purposefully string Kona along until the Merger was consummated in order to avoid conversion under the Kona Note.

78. Kona's reliance on ENZC's false representations made through Ray was in good faith and justifiable.

79. Based exclusively on ENZC's false representations, made through Ray, Kona changed its position to its disadvantage as Kona was deceived into believing that it did not have to promptly submit a notice of conversation.

80.     Kona's justifiable reliance upon ENZC's false representations made through Ray caused Kona monetary damages.

81.     To date, Enzolytics has refused to issue shares of common stock in the publicly traded company to Kona.

82.     By reason of the foregoing, Enzolytics should be equitably estopped from refusing to convert the Kona Note.

**COUNT II**

**<u>FRAUDULENT MISREPRESENTATION</u>**

83.     Kona repeats and realleges the allegations of Paragraphs 1 through 82 above, as if fully set forth herein.

84.     ENZC, through Ray, misrepresented material facts to Kona in email communications in November of 2020, including that:

    a.     ENZC could not initiate any conversions until November 26, 2020, at the earliest;

    b.     Kona would need to provide an opinion letter prior to any conversion; and

    c.     Kona had to wait to convert the Kona Note because of Ray's "situation."

85.     At the time these communications were made, Ray, and ENZC, were aware that these statements were false.

86.     The misrepresentations made by ENZC were made for the purpose of inducing Kona to rely on them so that Kona would fail to provide for timely notice of conversion, and so that ENZC could avoid conversion under the Kona Note.

87.     Kona's reliance on ENZC's false representations made through Ray was in good faith and justifiable.

88.     Based exclusively on ENZC's false representations, made through Ray, Kona changed its position to its disadvantage as Kona was deceived to believe that it did not have to promptly submit a notice of conversation.

89.     Kona's justifiable reliance upon ENZC's false representations made through Ray caused Kona monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, Defendant/Counterclaim Plaintiff Kona Concepts Inc. prays for judgment as follows:

A.     Denying Plaintiff/Counterclaim Defendant Enzolytics, Inc.'s requests for relief;

B.     Ordering Plaintiff/Counterclaim Defendant Enzolytics, Inc. to convert the Kona Note into shares of the publicly traded company or to pay Defendant/Counterclaim Plaintiff Kona Concept Inc. monetary damages in an amount in excess of $75,000 to be determined at trial;

C.     Awarding Defendant/Counterclaim Plaintiff Kona Concepts Inc. pre-judgment interest, attorneys' fees, costs, and expenses; and

D.     Granting Defendant/Counterclaim Plaintiff Kona Concepts Inc. such other and further relief in law and equity, as the Court may deem just and proper.

Respectfully submitted,

*/s/ Kaan Ekiner*
Kaan Ekiner, Esq. (#5607)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
(302) 295-2046
kekiner@cozen.com

John J. Muldoon III, Esq. (admitted *pro hac vice*)
**MULDOON & MULDOON, LLC**
111 West Washington Street
Suite 1500
Chicago, IL 60602
(312) 739-3550
jjm@muldoonlaw.com
*Attorneys for Defendant, Counterclaim*
*Plaintiff Kona Concepts, Inc.*

Dated: February 27, 2023

# EXHIBIT A

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER APPLICABLE STATE SECURITIES LAWS AND HAVE BEEN TAKEN FOR INVESTMENT PURPOSES ONLY AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION THEREOF. THE SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION AND QUALIFICATION WITHOUT, EXCEPT UNDER CERTAIN SPECIFIC LIMITED CIRCUMSTANCES, AN OPINION OF COUNSEL FOR THE HOLDER THAT SUCH REGISTRATION AND QUALIFICATION ARE NOT REQUIRED.

**Eco-Petroleum Solutions, Inc.,**
(a Delaware corporation)

*And its Subsidiary*

**Immunotech Laboratories, Inc.**
(A Nevada corporation)

**12% CONVERTIBLE PROMISSORY NOTE**
**All Terms Conditional on Receipt of $25,000 US BY**
**KONA Concepts Inc**

$ 25,000.00 (US)                                                      March 9, 2017

1.          Principal and Interest. **Eco-Petroleum Solutions, Inc.,** a Delaware corporation (the "Company") *And its Subsidiary* **Immunotech Laboratories, Inc.** (A Nevada corporation), for value received, hereby promises to pay to the order of KONA Concepts Inc. (the "Holder") in lawful money of the United States at the address of the Holder set forth below, the principal amount of TWENTY-FIVE THOUSAND Dollars ($25,000.00), together with interest at a rate equal to Twelve Percent (12%) per annum, compounded. The principal and any accrued interest on this Note are due and payable on or before March 9, 2018, the Holder may elect to convert this Note into shares of common stock ("Common Stock") of **Eco-Petroleum Solutions, Inc.,** (the "Company") pursuant to Section 3. Upon payment in full of all principal and interest payable hereunder, or conversion to common stock, this Note shall be surrendered to the Company for cancellation. The Company may prepay this Note at anytime without penalty, subject to the election of the Holder exercising their rights under Section 3.

2.          Security for Note. The Note shall be secured by the assets as provided in Attachment A, by the Company.

3.          Conversion of Note into Common Stock. The Note holder (the "Holder") in its sole discretion may elect to convert the Note into shares of the Company's common stock. The Holder may convert the Note, or portion thereof, at a discount to market equal to 50% discount to the lowest closing bid during the past 10 trading days. The Holder's right to convert the Note will be triggered upon the occurrence of any one of the following: (i) 6 months from the date of said

note, (ii) change in control the Company, (iii) the filing of a registration statement or offering, or (iv) election by the Holder. No fractional shares of common stock shall be issued upon conversion of the Note, and in lieu thereof, the number of shares of common stock to be issued for the Note converted shall be rounded down to the nearest whole number of shares of common stock.

3.1 Conversion Limitations. On conversion of the note to shares by the Company, the Note Holder shall not hold more than 9.9% of the outstanding stock of the Company at any time.

3.2 Authorized Shares. If at the time of conversion pursuant to this Section 2 there are insufficient authorized shares of Common Stock to permit conversion of this Note in full, then the Company shall take all corporate action necessary to authorize a sufficient number of shares to permit such conversion in full.

3.3 Stock Certificate. Upon conversion of this Note, the Holder shall surrender this Note, duly endorsed, at the principal office of the Company. At its expense, the Company shall, as soon as practicable thereafter, issue and deliver to the Holder at such principal office a certificate or certificates, either physically or via DWAC, for the number of shares to which the Holder shall be entitled upon such conversion (bearing such legends as are required by applicable state and federal securities laws and in the opinion of counsel to the Companies).

3.4 Fractional Shares. No fractional shares shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to the Holder upon the conversion of this Note, the Company shall pay to the Holder an amount in cash equal to the product obtained by multiplying the conversion price applied to effect such conversion by the fraction of a share not issued pursuant to the previous sentence. Upon conversion of this Note in full and the payment of the amounts specified in this Note, the Companies shall be released from all its obligations and liabilities under this Note.

4. Transfers. This Note may be transferred only in compliance with applicable federal and state securities laws and only upon surrender of the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, a new promissory note for like principal amount and interest will be issued to, and registered in the name of, the transferee. Interest and principal are payable only to the registered holder of this Note.

5. Attorneys' Fees. If the indebtedness represented by this Note or any part thereof is collected in bankruptcy, receivership or other judicial proceedings or if this Note is placed in the hands of attorneys for collection after default, the Company agrees to pay, in addition to the principal and interest payable hereunder, reasonable attorneys' fees and costs incurred by the Holder.

6. Notices. Any notice, other communication or payment required or permitted hereunder shall be in writing and shall be deemed to have been given upon delivery if personally delivered or upon deposit if deposited in the United States mail for mailing by registered or certified mail, postage prepaid, and addressed as follows:

If to the Holder:    KONA Concepts Inc
27 Barker Ave. Apt 1004
White Plains, NY 10601

If to the Company    **Eco-Petroleum Solutions, Inc.,**
**Immunotech Laboratories, Inc.**
Harry Zhabilov, CEO
120 WPomona Ave.
Monrovia, CA 91016

Each of the above addressees may change its address for purposes of this section by giving to the other addressee notice of such new address in conformance with this section.

    7.    Waivers. The Company hereby waives presentment, demand for performance, notice of non-performance, protest, notice of protest and notice of dishonor. No delay on the part of the Holder in exercising any right hereunder shall operate as a waiver of such right or any other right.

    8.    Usury Savings Clause. The Company and Holder intend to comply at all times with applicable usury laws. If at any time such laws would render usurious any amounts due under this Note under applicable law, then it is the Company's and Holder's express intention that the Company not be required to pay interest on this Note at a rate in excess of the maximum lawful rate, that the provisions of this Section 7 shall control over all other provisions of this Note which may be in apparent conflict hereunder, that such excess amount shall be immediately credited to the principal balance of this Note, and the provisions hereof shall immediately be reformed and the amounts thereafter decreased, so as to comply with the then applicable usury law, but so as to permit the recovery of the fullest amount otherwise due under this Note.

    9.    Governing Law. This Note is being delivered in and shall be construed in accordance with the laws of the State of New York, without regard to the conflicts of law's provisions thereof.

    10.    Amendment. Any amendment hereto or waiver of any provision hereof may be made only with the written consent of the Company and the Holder. This Note shall inure to the benefit of and bind the successors, permitted assigns, heirs, executors, and administrators of the Company and Holder.

**Eco-Petroleum Solutions, Inc.,**

**Immunotech Laboratories, Inc.**

By:
    Harry Zhabilov, CEO

**Bank of America**

**Online Banking**

---

**Business Advantage Chk - 4190: Account Activity Transaction Details**

---

| | |
|---:|:---|
| **Check number:** | 00000001001 |
| **Post date:** | 03/10/2017 |
| **Amount:** | -25,000.00 |
| **Type:** | Check |
| **Description:** | Check |
| **Merchant name:** | Check |
| **Transaction category:** | Cash, Checks & Misc: Checks |

# EXHIBIT B

**csc@bioclonetics.com** <csc@bioclonetics.com>       Mon, Oct 5, 2020 at 5:21 PM
To: Robert du Purton <rdupurton@gmail.com>
Cc: Harry Zhabilov <zhabilov@att.net>, peter aiello <peteraiello29@gmail.com>

Hi Robert,

The weekend was good. Hope your weekend went well also.

A discussion this Wednesday at 10 am EST would be good. We are getting a lot of interest from various groups and would like to know what you would propose.

We will ask Billy Ray to be on the call if that is OK with you and Peter.

We can use our call-in number unless you would prefer to use yours.

    Conference call in – 978 990-5139

    Code 8899670.

Look forward to the discussion. If you need any additional information from us before the call, please let us know.

Best regards,

Charles

# EXHIBIT C

 Gmail

peter aiello <peteraiello29@gmail.com>

# Term sheet

1 message

**Billy Ray** <billyvrayjr@yahoo.com>　　　　　Tue, Oct 27, 2020 at 12:23 PM
To: Peter Aiello <peteraiello29@gmail.com>
Cc: Charles Cotropia <csc@bioclonetics.com>, Harry Zhabilov <zhabilov@att.net>

Peter,

Charles has sent me the text you just sent him. I am sorry that I am not communicating the position clearly. Charles and Harry have asked me to handle the funding responses. The company is not interested in a consultant/agent situation. We have plenty of consultants. The company has $500K in bridge funding so the immediate needs are met. The merged entity will need additional funding, which the bridge lenders are also providing terms for $3 million. You and I have discussed the next steps being the Company need a terms sheet of what your group is willing to provide. The company is not going to provide the terms they are negotiating with the bridge lender but will listen to the terms you are wiling to offer. If you would rather wait until the current proposed funding is complete and then offer take out financing that is an option as well.

Please make sure that all future communications are copied to me. We hope we can find a way to complete a transaction with you based on terms received from your group but we can't disclose the terms we are negotiating as the bridge loan has a confidentiality clause in it.

Call if you need to.

Thanks,

Billy

# EXHIBIT D

 **Gmail**

peter aiello <peteraiello29@gmail.com>

# Conversion of a portion of my debts

6 messages

**peter aiello** <peteraiello29@gmail.com>                    Sat, Nov 14, 2020 at 9:39 AM
To: Harry Zhabilov <zhabilov@att.net>, billyvrayjr@yahoo.com
Cc: Naomi Alzate <naomi.alzate@gmail.com>, Peter Aiello <peteraiello29@gmail.com>

Dear Harry/Billy,
This is a request to Enzolytics, Inc., that I desire to convert a portion of my debts, into
common shares of Enzolytics,Inc.
Based, on the Sept.30,2018 Quarterly Filing, Cimarron Capital, Ic. has (2) outstanding
loans, and my other corporation Kona Concepts, Inc has (1) Loan Agreement.
Following are the (2) Loan Agreements I have decided to convert.

Kona Concepts, Inc. on the above date of the Quarterly Filing shows,
Principal.          Interest.          Total
$25,000            $4,664            $29,664     *Plus (2) year interest @ 8% = $35,000

Kona Concepts, Inc. $35,000 @ the (50%) discount ($.004) Equates into  8,775,000

Cimarron Capital,Ltd
Principal.          Interest          Total
$5,000.            $800.            $5800        *Plus (2) year interest @ 8% = $6765
Cimarron Capital Ltd. $5,800 @ the (50%) Discount ($.004)  equates Into  1,675,000

Based on the Terms of both loans, I have the option to convert my debt at a (50%)
discount to the lowest closing bid during the last 10 days.
In the last 10 days, the lowest closing bid  price of Enzolytics (ENZC) was $.008, which
would at a (50%) discount convert at ($.004)

Please send me whatever document, or paperwork you require to expedite this
transaction.
Best Regards,
Peter

* I have calculated the approximate interest that would be accumulated up to date

Sent from my iPad

**peter aiello** <peteraiello29@gmail.com>                    Sun, Nov 15, 2020 at 5:04 AM
To: Harry Zhabilov <zhabilov@att.net>, billyvrayjr@yahoo.com

# EXHIBIT E

**peter aiello** <peteraiello29@gmail.com>          Sun, Nov 15, 2020 at 5:04 AM
To: Harry Zhabilov <zhabilov@att.net>, billyvrayjr@yahoo.com

Dear Harry/Billy,
I seemed to make an error in the enclosed email sent.
As relates to the Cimarron Capital, Ltd combined principal and
interest, I mistakenly put the total amount as $5800, which
should have reflected $6765.
Based on the $6765 amount owed, that is where I calculated
the amount of shares
would equate to the number as it appears in my email sent is
the 1,675,000.
Hopefully, my emails will be sufficient evidence of my request
to the enclosed conversion of the portion of the debts owed.
Regards,
Peter
Sent from my iPad

# EXHIBIT F

**Billy Ray** <billyvrayjr@yahoo.com>                    Sun, Nov 15, 2020 at 8:37 AM
Reply-To: "billyvrayjr@yahoo.com" <billyvrayjr@yahoo.com>
To: "peteraiello29@gmail.com" <peteraiello29@gmail.com>, Harry Zhabilov
<zhabilov@att.net>

Peter,

You are going to have to wait. It is like you are not hearing me or ignoring my situation.
Harry would need my help and I can't give it right now. Hopefully later this week but it is
worse today.

Billy

Sent from Yahoo Mail on Android
[Quoted text hidden]

# EXHIBIT G

**Billy Ray** <billyvrayjr@yahoo.com>                    Mon, Nov 16, 2020 at 12:57 PM
Reply-To: "billyvrayjr@yahoo.com" <billyvrayjr@yahoo.com>
To: "peteraiello29@gmail.com" <peteraiello29@gmail.com>

Peter,

I am still working from a flat on my back position from my phone. The first thing I see is that you ar cal ulating interey that had already been accrued. The accrued interest on the disclosure statement is the life of the loan accrual. So you do jot need to calculate interest.

I have a call into Tiffany to confirm but based on my past experience you will have to have an opinion letter. Next I have to finish the filings to remove the stop sign before an attorney will issue an opinion letter and fi ally if you look at the press release around October 26th the initial funding required the company to stand still for 30 days on any conversions. Earliest lou could get this done is 11-26 but at the pace Jona is turning the qtrs iymt will probably be 12-10 before everything is filed including the opinion letter.

Hope this helps. ██████████████████████████████
████████

Thanks,

Billy

# EXHIBIT H

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:09 PM 11/19/2020
FILED 04:09 PM 11/19/2020
SR 20208450588 - File Number 4658525

CERTIFICATE OF MERGER
Enzolytics, Inc.,
Enzolytics Merger Corp. and
ENZC SUB, Inc.

Pursuant to Section 251 of the General Corporation Law of the State of Delaware (the "DGCL"), Enzolytics, Inc., a Delaware corporation, in connection with the merger of Enzolytics Merger Corp., a Delaware corporation, with and into ENZC SUB, Inc. (this being hereinafter referred to as the "Merger"), hereby certifies as follows:

FIRST: The names and states of incorporation of the constituent corporations to the Merger are:

| Name | State of Incorporation |
|------|------------------------|
| Enzolytics, Inc. | Delaware |
| ENZC SUB, Inc. | Delaware |
| Enzolytics Merger Corp. | Delaware |

SECOND: An Agreement and Plan of Merger, dated as of November 16, 2020, by and among Enzolytics, Inc., ENZC SUB, Inc., and Enzolytics Merger Corp. (the "Merger Agreement"), setting forth the terms and conditions of the Merger, has been approved, adopted, executed and acknowledged by each of the three participants to such Merger Agreement, in accordance with Section 251(g) of the DGCL.

THIRD: The name of the surviving corporation is ENZC SUB, Inc. (the "Surviving Corporation"), with Enzolytics Merger Corp. not surviving, with ENZC SUB, Inc. continuing in existence as the subsidiary of Enzolytics, Inc., the successor issuer.

FOURTH: The Certificate of Incorporation, as may be amended from time to time of the Corporation as in effect immediately prior to the Merger shall be the certificate of incorporation of the Surviving Corporation with the addition of a new Article, which shall be added thereto, reading as follows:

"Other than the election or removal of directors of the Corporation, any act or transaction by or involving the Corporation that requires for its adoption under the General Corporation Law of the State of Delaware or this Certificate of Incorporation, as may be amended from time to time the approval of the stockholders of the Corporation shall, pursuant to Section 251(g)(7)(i) of the General Corporation Law of the State of Delaware, require, in addition, the approval of the stockholders of the Corporation (or any successor by merger), by the same vote as is required by the General Corporation Law of the State of Delaware and/or this Certificate of Incorporation, as may be amended from time to time."

FIFTH: The Merger shall become effective upon filing.

SIXTH: The executed Merger Agreement is on file at the office of the Surviving Corporation located at 2000 North Central Expressway, Plano, Texas 75074. A copy of the Merger

Agreement will be furnished by the Surviving Corporation, on request and without cost to any stockholder of either corporation.

SEVENTH: Following the Merger and its effectiveness, Enzolytics, Inc. will become the parent corporation to ENZC SUB, Inc. and its sole shareholder, with Enzolytics Merger Corp. ceasing to exist.

IN WITNESS WHEREOF, this Certificate of Merger has been executed on this November 16, 2020.

**Enzolytics, Inc.,**
a Delaware corporation

Name: _____ Charles Cotropia, CEO and President


**ENZC SUB, Inc.,**
a Delaware corporation

Name: _____ Charles Cotropia, CEO and President


**Enzolytics Merger Corp.,**
a Delaware corporation

Name: _____ Charles Cotropia, CEO and President